IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| PAULA S., ON BEHALF OF ERIC S.,[1] | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 5:17-CV-305-BR |
| | § | |
| ANDREW M. SAUL, Commissioner, | § | |
| Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
TO REVERSE THE DECISION OF THE COMMISSIONER**

Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the Commissioner's decision finding plaintiff's disability had ended for purposes of receiving supplemental security income (SSI) benefits under Title XVI of the Social Security Act. After considering the pleadings, briefs, and administrative record, the undersigned recommends the Commissioner's decision be reversed, and the case be remanded to the Commissioner for further administrative review consistent with these findings and conclusions.

I.
FACTUAL/PROCEDURAL HISTORY[2]

On August 26, 2004, the Commissioner purportedly found plaintiff disabled with a July 1,

---

[1] It is this Court's practice to identify plaintiff using only the first name and last initial in determinative opinions in social security disability cases. This ensures that the public maintains access to the opinions (in compliance with Rule 5.2(c)(2)(B) of the Federal Rules of Civil Procedure and the E-Government Act of 2002) while still protecting the privacy of non-government parties' identities within the opinion. Although the Court has substituted Eric S.'s mother, Paula S., as plaintiff (*see* ECF 47) in this proceeding, the Court will continue to refer to Eric S. as the plaintiff in these findings and conclusions.

[2] The administrative record filed with the Court does not contain documentation of all of plaintiff's prior proceedings. While the Court does not doubt various filings were made, proceedings took place or decisions entered, the Court does not have the documentary evidence verifying many of the precise facts of the procedural history and has thus utilized qualifiers such as "apparently" and "purportedly" in reference to those undocumented filings.

2004 onset date of disability.[3] This finding of disability was purportedly due to plaintiff's severe impairments of borderline intellectual functioning and attention-deficit hyperactivity disorder (ADHD). (Tr. 186).[4]

In May 2005, plaintiff apparently filed an application for SSI benefits, which was subsequently granted, resulting in plaintiff receiving SSI payments. (ECF 1 at 7-8). In October 2005, plaintiff obtained part-time employment as a grocery sacker. (Tr. 258, 268). This part-time employment apparently ended in 2006. (Tr. 244, 246). In 2007, plaintiff reported that despite applying for various jobs, he was unable to obtain employment. (Tr. 733-34). Plaintiff did not have any reportable earnings for 2007 and only minimal earnings as a temporary worker at a "temp agency" in 2008. (Tr. 244, 246).

On September 9, 2009, plaintiff obtained full-time employment as a "chip picker" at a potato chip factory where his mother was employed as the Human Resources manager.[5] (Tr. 258, 268, 776-78). At some point in 2009 it appears plaintiff's SSI payments were terminated because his earnings exceeded the Substantial Gainful Activity ("SGA") threshold. (ECF 1 at 8). After approximately 1 ½ years as a "chip picker" at the factory, plaintiff's job duties were modified to include being a "cardboard tray folder" and "box preparer." (Tr. 395, 757-59, 778).

In November 2012, plaintiff applied for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act. (Tr. 199-201, 254-57). Plaintiff's applications for DIB were apparently denied initially and, on December 7, 2012, denied again on reconsideration. (Tr. 201). It appears that while the appeal of the denial was pending, plaintiff's

---

[3]Plaintiff graduated high school on May 29, 2004, having participated in special education core classes. (Tr. 295). It appears plaintiff had alleged March 4, 2003, the date he turned 18 years old, as his onset date of disability in an application for disability insurance benefits. (*Id.*).

[4]For purposes of citing the Administrative Record filed at Docket Entry 42, the continuously running "PageID" number has been used after the abbreviation "Tr." without reference to whether the document was filed under attachment #1 (42-1) or #2 (42-2).

[5]Half of plaintiff's salary for the first three (3) months of his employment was funded by a state program that assists individuals with disabilities. (Tr. 776-77).

SSI benefits were reinstated. (ECF 1 at 8). On December 31, 2012, plaintiff's employment at the chip factory was terminated. (Tr. 778).

On February 5, 2013, plaintiff filed another application or an amended application for DIB alleging a disability onset date of December 31, 2012, the last day of plaintiff's employment. (Tr. 252-53). On February 11, 2013, the Administration requested the folder from petitioner's prior August 26, 2004 decision finding plaintiff disabled for DIB; however, the record is silent as to whether the folder was received. (Tr. 327). On February 19, 2013, plaintiff's application for DIB was temporarily processed with a "no determination" finding while the electronic file was being converted to paper. (Tr. 202-05).

In an apparent continuation of his February 5, 2013 DIB application, plaintiff was referred to Dr. Constance Smith for a consultative psychological clinical interview and mental status exam. On April 15, 2013, plaintiff presented to Dr. Smith. That same date, Dr. Smith prepared a mental status report diagnosing plaintiff with ADHD, a Communication Disorder, an Occupational Problem, Mild Mental Retardation (based on a previous assessment), and Psychosocial Stressors (social interaction with peers and occupational problems), but indicating plaintiff's prognosis was good "with continued monitoring via mother." (Tr. 430-34). Dr. Smith also completed a Capability Opinion opining plaintiff would not be able to manage benefit payments. (Tr. 435).

On May 17, 2013, a medical consultant made findings regarding the medical portion of plaintiff's disability determination. Specifically, the medical consultant completed a *Psychiatric Review Technique* form noting plaintiff's organic mental disorders necessitated an assessment of his residual functional capacity (RFC)[6] (Tr. 440-52), and a *Mental Residual Functional Capacity*

---

[6] RFC is what an individual can still do despite his/her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his/her capacity to do work-related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. SSR 96-8p.

*Assessment* form finding plaintiff was "maximally able to understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately [with] co-workers and supervisors, and respond appropriately to changes in routine work setting[s]." (Tr. 436-38). On June 7, 2013, plaintiff's claim for DIB benefits was denied. (Tr. 216-19, 220). Although the undersigned finds no such determination in the administrative record, this denial purportedly found plaintiff "was no longer disabled as of May 1, 2013." (Tr. 186).

On June 28, 2013, plaintiff filed another application or an amended application for DIB. (Tr. 250). On December 16, 2013, plaintiff's DIB claim on reconsideration was processed as a "no determination" in order to have the reconsideration determination considered with plaintiff's "continuing disability review" for SSI benefits. (Tr. 364).

On February 24, 2014, plaintiff presented to Dr. Patricia Driskill for a psychological evaluation "related to a possible Autism Spectrum Disorder." (Tr. 470-81). On March 7, 2014, Dr. Driskill prepared a report of the evaluation finding plaintiff did not meet the diagnostic criteria for autism, but has "some social deficits," difficulties with communication and socialization related to a continued diagnosis of mild intellectual disability. (*Id*.) On May 15, 2014, Dr. Driskill also completed a Medical Source Statement for the Administration regarding plaintiff's mental ability to do work-related activities, finding marked to mild limitations. (Tr. 735-37). Thereafter, on June 26, 2014, plaintiff's application for DIB was denied on reconsideration (Tr. 186, 211-14).

On April 6, 2016, an Administrative Law Judge (ALJ) conducted a hearing on petitioner's DIB application. (Tr. 748-90). At the hearing, the ALJ admitted various exhibits into evidence without objection and heard sworn testimony from plaintiff, a witness (plaintiff's mother), and a Vocational Expert (VE). On the date of the hearing, plaintiff was 31 years old. (Tr. 754).

On July 29, 2016, the ALJ apparently issued two (2) decisions – one addressing plaintiff's

claim for SSI under Title XVI, and a separate decision addressing plaintiff's claim for a period of disability and DIB under Title II. (Tr. 186). However, the only decision before this Court is the ALJ's decision addressing plaintiff's SSI claim. In his decision, the ALJ, utilizing the "continuing disability review" process set forth in 20 CFR § 416.994, found plaintiff's disability ended under section 1614(a)(3)(A) of the Social Security Act[7] on May 1, 2013, and that plaintiff had not become disabled again since that date. (Tr. 186, 198). On October 24, 2017, the Appeals Council denied plaintiff's request for review, rendering the ALJ's decision as the Commissioner's final decision. (Tr. 179-82). *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005).

## II.
## APPLICABLE LAW

When an individual has been found to be entitled to SSI benefits, his or her "continued entitlement to such benefits must be reviewed periodically" to determine whether the "recipient" still qualifies for benefits on the basis of disability. 20 C.F.R. § 416.994(a). In this "continuing disability review," the Administration initially considers whether the recipient has an impairment or combination of impairments that meets or equals a Listing.[8] 20 C.F.R. § 416.994(b)(5)(i). If the recipient does not have a Listed impairment, the Administration must then consider: (1) whether there has been any medical improvement (MI) in the recipient's impairments and, if so, (2) whether this MI is related to the recipient's ability to work or is subject to an exception to MI.[9] 20 C.F.R. § 416.994(b).

---

[7]Found at 42 U.S.C. § 1382c, section 1614(a)(3)(A) provides, in part, "[A]n individual shall be considered to be disabled for purposes of this title if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

[8]Appendix 1 to Subpart P of Part 404 of Title 20 CFR, Chapter III, sets forth the Listing of Impairments that qualify as disabling impairments.

[9]Regulations set out a detailed eight-step process for determining whether a disability benefit recipient continues to be disabled. 20 C.F.R. § 416.994(b)(5). As this recommendation is based on the ALJ's determination of MI at Step 2, further explanation of the remaining steps is unnecessary.

MI is defined as "any decrease in the medical severity" of the recipient's impairment(s) "which was present at the time of the most recent favorable medical decision that [the recipient was] "disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1)(i). A "decrease in medical severity" determination "must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the recipient's] impairment(s)." (*Id.*). To make such a determination, the "most recent favorable medical decision," *i.e.*, "the latest decision involving a consideration of the medical evidence and the issue of whether [the recipient was] disabled or continued to be disabled which became final" is utilized as a point of comparison. 20 C.F.R. § 416.994(b)(1)(vii). This decision is referred to as the "comparison point decision" (CPD).

To determine whether MI has occurred, the Administration compares the "current medical severity" of the recipient's impairments to the "medical severity" of those same impairments at the time of the CPD. (*Id.*). If MI has occurred, the Administration must then compare the recipient's current RFC "based on the previously existing impairments" with the recipient's prior RFC in order to determine whether the MI is "related to [the recipient's] ability to do work." (*Id.*). If the recipient has not experienced MI, then the Administration will find the recipient's disability continues, unless one or more of the exceptions to MI applies. 20 C.F.R. § 416.994(b). If MI related to the recipient's ability to work has not occurred and no exception applies, then the recipient's benefits will continue. (*Id.*). Even where MI "related to [the recipient's] ability to work has occurred or an exception applies, the Administration "must also show that [the recipient is] currently able to engage in substantial gainful activity" (SGA) before he can find the recipient is "no longer disabled." (*Id.*).

### III.
### THE ALJ'S DECISION

In his decision, as procedural history of this case, the ALJ noted that in a decision dated

August 26, 2004, plaintiff "was found disabled as of June 1, 2004." (Tr. 186). The ALJ also noted that "[o]n May 17, 2013, it was determined that [plaintiff] was no longer disabled as of May 1, 2013."[10] The ALJ recited that after the "May 17, 2013" determination was upheld on reconsideration, the case came before the ALJ to hold a hearing on plaintiff's claims for both DIB and SSI benefits.

The ALJ recited, as the applicable law for this case, the section 416.994 procedures for evaluating continuing disability. In his preliminary findings, the ALJ identified the August 26, 2004 DIB determination as the "most recent favorable medical decision" finding plaintiff was disabled, the CPD. (Tr. 187). The ALJ also noted the 2004 CPD found plaintiff had medically determinable impairments of borderline intellectual functioning and attention-deficit hyperactivity disorder (ADHD), and that these impairments resulted in an RFC "that precluded all employment because of medical and vocational considerations." (Tr. 188). The ALJ also noted that based on the medical evidence of record, plaintiff had not "develop[ed] any additional impairments after the [2004] CPD through May 1, 2013"[11] and, therefore, plaintiff's "current impairments are the same" as the impairments found in the 2004 CPD. (*Id.*). Other than a non-specific, general reference to the CPD in a subsequent finding (Tr. 195), these preliminary findings contain the ALJ's only references to the 2004 CPD in his decision.

The ALJ then made the finding that plaintiff's impairment or combination of impairments "since May 1, 2013" did not meet or medically equal the severity of a Listed impairment. (Tr. 188). As a result, the ALJ proceeded to consider whether there had been any MI in plaintiff's impairments.

---

[10]The administrative record contains the June 7, 2013 Notice of Disapproved Claim and Explanation of Determination (Tr. 216-19, 220); however, as previously noted, the undersigned has not found a document stating plaintiff "was no longer disabled as of May 1, 2013."

[11]Specifically, the ALJ found no additional impairments after the CPD "through May 1, 2013," presumably another reference to the purported May 17, 2013 determination that plaintiff was "no longer disabled as of May 1, 2013."

The ALJ made the specific finding that "[t]he medical evidence supports a finding that, as of May 1, 2013, there had been a decrease in the medical severity of [plaintiff's] impairments" and, consequently, that MI "occurred as of May 1, 2013." (Tr. 190). In the section of his decision addressing MI, and apparently as support for his finding of MI, the ALJ noted:

1. plaintiff's childhood history of low scoring, *i.e.*, at or below 70,[12] on six (6) intellectual ability tests by his school district from 1996 to 2003;

2. plaintiff's delayed participation in special education classes "due to an Intellectual Disability" until high school;

3. an intelligence test for children administered to plaintiff in 2000 wherein scoring of Verbal IQ of 58, Performance IQ of 55, and Full Scale IQ of 53 placed him in the 1st percentile, suggesting mild intellectual disability;

4. a behavior scale test indicating plaintiff has significant deficits in the area of communication and consistent academic difficulties, but no significant adaptive difficulties in the areas of daily living or socialization, based on an interview of plaintiff's mother;

5. Dr. Driskell's February 2014 psychological evaluation finding plaintiff's higher scores of Verbal IQ of 73, Nonverbal IQ of 96, and IQ Composite of 82 on an intelligence test "suggest[ed] an improvement in intellectual ability [sic] than previously indicated"; and

6. "[i]n addition," plaintiff's two (2) years of attendance at a community college and his 3-years of employment at the potato chip factory, work the ALJ deemed as "substantial gainful activity." (*Id.*).

The ALJ then determined that, "beginning on May 1, 2013," plaintiff had the RFC to perform a "full range of work at all exertional levels" with the following nonexertional limitations: (1) simple job tasks only, *i.e.,* routine repetitive tasks with little variance in duty and those that involve only simple judgment making, (2) only occasional public contact, and (3) only occasional interaction with co-workers and supervisors. (Tr. 190-91). The ALJ also found plaintiff's MI was "related to the ability to work" because it had "resulted in an increase" in plaintiff's RFC, *viz.*, that

---

[12] With the sole exception of an IQ score of 77 on an intelligence test for children in March 1996.

the RFC plaintiff "has had since May 1, 2013 is less restrictive" than the RFC plaintiff "had at the time of the [2004] CPD." (Tr. 195).

The ALJ further found that, "[b]eginning May 1, 2013," plaintiff's impairments of ADHD and mild borderline intellectual functioning "continued to be severe." (Tr. 195-96). The ALJ then determined that, "[b]eginning on May 1, 2013," plaintiff was capable of performing his past relevant work (PRW)[13] as a "chip picker" because, based on VE testimony, this work did not require the performance of work-related activities precluded by plaintiff's RFC. (Tr. 196-97). The ALJ did not consider whether plaintiff could perform his past work as a "box preparer" because this job did not qualify as PRW because plaintiff did not perform the work at SGA level.

Even though he found plaintiff could perform PRW, the ALJ made the alternative finding that, "[b]eginning on May 1, 2013," plaintiff had been able to perform a significant number of other jobs in the national economy. (Tr. 197-98). Specifically, based on the VE's testimony, the ALJ found plaintiff had been able to perform the jobs of grounds keeper, auto detailer, and laundry worker. (*Id.*). Based on the VE's testimony, the ALJ concluded that "since May 1, 2013," plaintiff had been capable of making a successful adjustment to work that existed in significant numbers in the national economy, and that a finding of "not disabled" was therefore appropriate. (Tr. 198). The ALJ thus concluded plaintiff's disability under section 1614(a)(3)(A) ended on May 1, 2013, and plaintiff had not become disabled again since that date. (*Id.*).

IV.
STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining (1) whether "substantial evidence" exists in the record, considered as a whole, to

---

[13]Past relevant work is work done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the individual to learn to do it. 20 C.F.R. § 404.1565(a).

support the Commissioner's factual findings and ultimate decision, and (2) whether the Commissioner applied the correct legal standards or if any errors of law were made. *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997). To determine whether "substantial evidence" of disability exists, the court considers four elements of proof: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).

If the Commissioner's findings are supported by "substantial evidence," then they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts. *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977). "Substantial evidence" is "such relevant evidence as a responsible mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). Only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no "substantial evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Stated differently, the level of review is not de novo. If this Court finds "substantial evidence" to support the Commissioner's decision, this Court must uphold the decision. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

This Court's review of the Commissioner's decisions regarding "continued disability" is similarly limited. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Greenspan v.*

*Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)). Absent exceptions not relevant here,[14] the Court will find "substantial evidence" supports the Commissioner's decision to terminate a recipient's benefits only if "substantial evidence" demonstrates *both* MI and that "the individual is now able to engage in substantial gainful activity." *Hallaron v. Colvin*, 578 F. App'x 350, 352–53 (5th Cir. 2014); *see also Gardner v. Astrue*, No. 4:10-CV-226-A, 2011 WL 2292179, at 3 (N.D. Tex. Apr. 19, 2011).

## V.
## ISSUE

Plaintiff contends the ALJ's finding of MI is not supported by substantial evidence and, therefore, the ALJ's ultimate decision that plaintiff's disability ended May 1, 2013 and plaintiff had not become disabled again since that date is not supported by substantial evidence.[15]

## VI.
## ABSENCE OF THE COMPARATIVE POINT DECISION (CPD)

In his decision, the ALJ identified an August 26, 2004 DIB determination as the CPD in this case, *i.e.*, the "most recent favorable medical decision" finding plaintiff disabled. (Tr. 187). The ALJ then referenced three (3) purported findings from that 2004 CPD: (1) that plaintiff had medically determinable impairments of borderline intellectual functioning and ADHD, (2) that such impairments resulted in an RFC determination, and (3) that this undescribed RFC "precluded all employment because of medical and vocational considerations." (Tr. 188). Without identifying any of the specifics of the RFC determination in the 2004 CPD, the ALJ also indicated in his

---

[14] A determination of a recipient's continued entitlement to benefits is not required if the prior determination awarding benefits was fraudulently obtained or if the recipient is engaged in substantial gainful activity, cannot be located, or fails, without good cause, to cooperate in a review of his or her entitlement. *See* 42 U.S.C. §1382c(a)(4).

[15] Plaintiff asserts four (4) grounds challenging particular findings of the ALJ to argue the decision is not supported by substantial evidence. Only plaintiff's ground challenging the sufficiency of the evidence to support the ALJ's finding of MI has been restated here as the recommendation of reversal and remand is based solely on that ground. The undersigned acknowledges plaintiff's specific arguments under this ground may differ somewhat from the discussions set forth herein; however, the language of the asserted ground is broad enough to encompass a thorough discussion of whether substantial evidence supports the MI finding.

decision that the prior RFC was more restrictive than plaintiff's current RFC for a full range of work at all exertional levels restricted by the non-exertional limitations of only simple job tasks and only occasional public contact and interaction with co-workers and supervisors. (Tr. 190, 195). Utilizing the 2004 CPD as the "point of comparison" for determining whether MI had occurred, the ALJ found "[t]he medical evidence supports a finding that. . . there had been a decrease in medical severity of the impairments." (Tr. 190).

The 2004 CPD relied upon by the ALJ as the "point of comparison" in determining MI of plaintiff's impairments occurred in this case is <u>not</u> included in the administrative record provided to this Court. Therefore, the above purported findings from the CPD provided in the ALJ's discussion of whether "[m]edical improvement occurred," and the fact that the CPD purportedly found plaintiff was disabled, is <u>all</u> the information the Court has about the CPD. Nowhere in his decision did the ALJ reference any other findings from the 2004 CPD, much less attempt to recreate the CPD in his decision. In fact, the ALJ does not include any direct citation to the CPD, or even make any direct comparisons between the 2004 CPD findings and plaintiff's current conditions. The administrative record does not provide any explanation for the absence of the CPD in the record.

The Court acknowledges the CPD <u>itself</u> is not required to be in the record for an ALJ to make a finding of MI. However, whether MI has occurred involves a "comparative inquiry" between the medical severity of a recipient's current impairments and the medical severity of his or her impairments as determined by the CPD. *See Neff v. Colvin*, 2015 WL 4878720 at 2 (M.D. Pa. Aug. 15, 2015). Therefore, in order to justify a finding of MI, an ALJ's decision should, at a minimum, include citation to or comparisons with the CPD or its supporting records, if not a re-creation of the CPD to the fullest extent possible. *See Ball v. Berryhill*, 2019 WL 2079841 at 7-8 (E.D. La. Feb. 27, 2019). Although it does appear the ALJ had some level of knowledge of the

contents of the 2004 CPD when making his current decision, he did not set forth any specific findings concerning the prior CPD or make detailed comparisons to the CPD in his decision. Without the 2004 CPD, this Court cannot determine the specifics of the CPD or what exact information the ALJ had concerning the prior CPD.[16]

The undersigned notes this does not appear to be a situation where the prior file was missing all together.[17] Namely, the ALJ's few vague references to the CPD seem to indicate that the CPD, or at least portions of the file yielding a basis for the CPD, were available to the ALJ. That file, however, like the CPD itself, has not been made available to the Court. Without the prior file and CPD, without any descriptive detail of the CPD or portions of the file relevant to the CPD in the ALJ's decision, or any comparative analysis between the CPD and current medical evidence in the decision, this Court is unable to determine not only the specifics of the CPD but also the relevant evidence upon which the CPD was based. Without more, the ALJ's determination that "there had been a decrease in medical severity of the impairments" is largely conclusory and does not reflect a substantive comparison between the ALJ's current findings and the CPD's findings. The absence of the CPD file from the record and the lack of any details of the CBD in the ALJ's decision, while not precluding a finding of MI and not legal error in and of itself, does prevent the Court from determining not only whether the ALJ had sufficient evidence in the record to even make a finding of MI but, more importantly, whether the ALJ's finding of MI is actually supported by substantial evidence. Specifically, the absence of the CPD precludes any substantive comparison of the findings made in the 2004 CPD with the ALJ's current findings in his decision and prohibits

---

[16]In fact, the administrative record contains very few of plaintiff's pre-August 26, 2004/pre-CPD medical records. *See* Disability Report Adult, dated July 12, 2004 (Tr. 294-303), Daily Activity Questionnaire, dated August 11, 2004 (Tr. 329-32), and Lubbock Independent School District records and academic assessments (Tr. 406-21; 426-30).

[17]Where a prior CPD file cannot be located and the recipient can now engage in SGA based on all current impairments, if relevant parts of the prior CPD record are not reconstructed, a determination of MI cannot be found. 20 C.F.R. §416.994(b)(2)(iv)(E); s*ee Hallaron*, 578 Fed. App'x at 352-53.

analysis of whether the ALJ's finding that MI occurred in this case is supported by substantial evidence. Consequently, the undersigned finds substantial evidence does not exist in the record, considered as a whole, to support the ALJ's finding that MI occurred in this continuing disability review for SSI benefits.

## VII.
## FINDING OF MEDICAL IMPROVEMENT (MI)

Reviewing the ALJ's MI finding based solely on the record before the Court, *i.e.*, without any specifics about the CPD, the RFC determined therein, or the evidence relied upon in making the CPD, also results in a determination that the finding that MI occurred is not supported by substantial evidence. "Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing 42 U.S.C. § 423(f) and *Griego v. Sullivan*, 940 F.2d 942, 944 n.1 (5th Cir. 1991)). Here, the ALJ failed to carry that burden.

As a side note, the undersigned initially recognizes case law indicates, in certain instances, an ALJ's finding that MI has occurred can be justified based on the ALJ's initial determination that a recipient does not have an impairment or combination of impairments that meet a Listing. *See Sneed v. Colvin*, No. CV 14-600-SCR, 2015 WL 7459993, at 6–7 (M.D. La. Nov. 24, 2015). However, such cases appear to be limited to instances where the recipient was initially found disabled in the CPD as a result of a Listed impairment. Here, the ALJ noted plaintiff's impairments found in the 2004 CPD resulted in an RFC assessment that precluded plaintiff from working. (Tr. 188). The inclusion of an RFC assessment in the 2004 CPD indicates plaintiff's prior disability determination was not based on plaintiff having a Listed impairment. Therefore, to the extent, if any, defendant is arguing the ALJ's initial finding that plaintiff's impairments did not meet a

Listing "since May 1, 2013," standing alone, justifies or provides substantial evidence for finding MI had occurred, such argument is without merit. (Tr. 362-63).

Further, as noted above, the ALJ cited the following as the bases for his finding that MI occurred:

1. plaintiff's childhood history of low scoring, *i.e.*, at or below 70,[18] on six (6) intellectual ability tests by his school district from 1996 to 2003;

2. plaintiff's delayed participation in special education classes "due to an Intellectual Disability" until high school;

3. an intelligence test for children administered to plaintiff in 2000 wherein scoring of Verbal IQ of 59, Performance IQ of 55, and Full Scale IQ of 53 placed him in the 1st percentile, suggesting mild intellectual disability;

4. a behavior scale test indicating plaintiff has significant deficits in the area of communication and consistent academic difficulties, but no significant adaptive difficulties in the areas of daily living or socialization, based on an interview of plaintiff's mother;

5. Dr. Driskell's February 2014 psychological evaluation finding plaintiff's higher scores of Verbal IQ of 73, Nonverbal IQ of 96, and IQ Composite of 82 on an intelligence test "suggest[ed] an improvement in intellectual ability [sic] than previously indicated"; and

6. "[i]n addition," plaintiff's two (2) years of attendance at a community college and his 3-years of employment at the potato chip factory, work the ALJ deemed as "substantial gainful activity."

The undersigned has categorized the above findings of MI as a "decrease in medical severity" or a suggested "improvement in intellectual ability" based on testing, college attendance or employment. Again, in order to make a determination of MI, the ALJ must compare medical evidence upon which the prior finding of disability was based with the recipient's current medical evidence to determine whether there have been changes, *i.e.*, improvement, in the symptoms, signs and/or laboratory findings associated with the recipient's impairments." 20 C.F.R. §§ 416.994(b)(1)(i) and (b)(2)(i). Considering this requirement, the undersigned finds none of the

---

[18] With the sole exception of an IQ score of 77 on an intelligence test for children in March 1996.

bases given by the ALJ for his finding that MI occurred is supported by substantial evidence.

### A. Improvement in Intellectual Ability - Testing

In his MI discussion, the ALJ summarized plaintiff's pre-CPD (pre-August 26, 2004) medical evidence by noting plaintiff's school district had "evaluated" him six (6) times, that plaintiff consistently scored at or below 70 on intellectual ability standard tests (as recently as February 2003), with the only exception being a March 1996 test for children where plaintiff scored a 77. (Tr. 190). The ALJ also noted May 2000 testing by Dr. Driskell, when plaintiff was 15 years old, resulting in scores much lower than 70 that placed him in the 1st percentile suggesting mild intellectual disability, as well as the interview of plaintiff's mother at the same time indicating plaintiff had significant deficits in the area of communication and consistent academic difficulties, but no significant adaptive difficulties in the areas of daily living or socialization.

The ALJ then, presumably as a reference to plaintiff's current medical evidence, cited plaintiff's higher scores[19] on the February 24, 2014 "intelligence" test conducted by Dr. Driskell as "suggest[ing] an improvement in intellectual ability [sic] than previously indicated." (Tr. 190, 475-76). This was the full extent of the ALJ's MI discussion finding a "decrease in medical severity" of plaintiff's intellectual impairments.

In Dr. Driskell's 2014 test, the apparent primary basis relied upon by the ALJ to show improvement in plaintiff's intellectual ability, the doctor stated the test conducted was "to get a current estimate of [plaintiff's] intellectual ability" and explained his scoring placed him "in the Below Average range of intellectual ability when compared to others his age in the standardization sample and indicates the chances are that 90 out of 100 times, his true ability would fall" in the midrange between his high and low scores. (Tr. 475). Dr. Driskell further stated plaintiff's "score

---

[19]The ALJ simply cited, *in toto*, that plaintiff "earned a Verbal IQ of 73, a Nonverbal IQ of 96, for an IQ Composite of 82" on the Kaufman Brief Intelligence Test-II.

should be considered with some caution, relative to [plaintiff's] overall intellectual ability, as it is only a brief measure of two skills and does appear to be inconsistent with all previous intelligence scores for [plaintiff]." (Tr. 476). In the "Summary and Clinical Impressions" of her report, Dr. Driskell reiterated that although plaintiff's score on the intelligence test "could suggest higher intellectual ability than was previously indicated for [plaintiff], the score [was] based only on two discrete skills and, therefore, is likely not [to] be the most valid estimate of [plaintiff's] overall intellectual ability." (Tr. 479).

In his decision, the ALJ did not reference Dr. Driskell's above-quoted directives concerning the limited significance of plaintiff's scores on this one test. Instead, the ALJ relied almost exclusively on plaintiff's scores on this one test as the basis for his finding that "there had been a decrease in medical severity" of plaintiff's intellectual impairment. Moreover, the ALJ provided no argument in support of, nor did he engage in any analysis or provide any explanation for, his conclusion that plaintiff's scores on this one limited test, the significance of which were specifically diminished by the examiner, Dr. Driskell, "suggest an improvement in intellectual ability [sic] than previously indicated." Consequently, the undersigned finds the ALJ's finding of MI on the basis of testing, and this statement in particular, entirely conclusory. Considering the administrative record and the extremely limited discussion of his finding of MI, the undersigned finds the ALJ's "suggestion" of improvement in plaintiff's "intellectual ability" compared to that previously indicated, as well as any finding that MI occurred on this basis, is not supported by substantial evidence.

### B. <u>Improvement in Intellectual Ability - College Attendance</u>

Liberally construing the decision, it appears the ALJ may also be suggesting, "[i]n addition," that plaintiff's 2-year attendance at a community college constituted a basis for finding MI had occurred. (Tr. 190). If it is the ALJ's position that plaintiff's college attendance, in and of

itself, demonstrated "improvement in intellectual ability" or a "decrease in medical severity" of plaintiff's intellectual impairments, the fact that plaintiff could not and did not take courses that were academic in nature casts serious doubt on this argument. (ECF 1 at 3-4; Tr. 419-20). The record reflects plaintiff was granted accommodations for placement exams in order to take remedial classes but was unable to approach the minimum passing scores, despite multiple attempts. (ECF 1 at 5-6; Tr. 418-19). Consequently, any assertion that plaintiff's participation in college courses was, in and of itself, indicative of improvement in intellectual functioning is without basis and not supported by substantial evidence.

### C.  Improvement in Intellectual Ability - Employment

Again, liberally construing the decision, it appears the ALJ may also be suggesting, "[i]n addition," that plaintiff's "work[] at substantial gainful activity for 3 years at a potato chip factory" constituted a basis for finding MI had occurred. (Tr. 190). If it is the ALJ's position that plaintiff's 3-year employment, in and of itself, demonstrated "improvement in intellectual ability" or a "decrease in medical severity" of plaintiff's intellectual impairments, the ALJ has not provided any argument in support of, engaged in any analysis of, or provided any explanation for this argument. While case law suggests employment can properly be used as an additive factor or additional basis in finding MI in a case involving a recipient's borderline intellectual functioning, *see Valdez v. Colvin*, 2013 WL 6418973 (W.D. Tex. Dec. 6, 2013) at *8, the ALJ did not specify in what respect he deemed plaintiff's employment (whether considered individually or collectively) as warranting a finding of MI. Consequently, any assertion that plaintiff's 3-year employment at the potato chip factory was, in and of itself, conclusive proof of "a decrease in medical severity" of plaintiff's intellectual impairment or "improvement in [plaintiff's] intellectual ability" is without basis and not supported by substantial evidence.

The ALJ also specifically referred to plaintiff's 3 years of work at the potato chip factory

as being "substantial gainful activity." Any contention of the ALJ that it was the level of plaintiff's work (SGA-level) for 3 years that constituted a basis for finding MI occurred was thwarted by the ALJ's subsequent finding, made in his analysis of whether plaintiff's prior jobs constituted PRW, that plaintiff's job as a box preparer at the potato chip factory was <u>not</u> performed at SGA level.[20] (Tr. 196). The ALJ did not indicate the specific basis for finding such work was not performed at SGA level.[21] Even so, the record appears to indicate plaintiff worked as a box preparer for the last half of his 3-year tenure at the factory. Consequently, while the ALJ cited 3 years of SGA-level work at the potato chip factory as a purported basis for finding MI occurred, he subsequently negated, or at least diminished, this basis by then finding that only 1 1/2 years of that work was at SGA-level.[22] The ALJ did not explain how he evaluated or weighed plaintiff's employment as a purported basis for MI, nor did he provide any argument in support of, or engage in any analysis of, such an argument. Under these circumstances, the undersigned finds plaintiff's employment alone did not demonstrate "improvement in intellectual ability" or a "decrease in medical severity" of plaintiff's intellectual impairments. Consequently, the undersigned finds substantial evidence does not support a finding of MI on the basis of plaintiff's employment during the relevant period.

## VIII.
## RECOMMENDATION

It is the RECOMMENDATION of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the Commissioner be REVERSED and the case REMANDED for further administrative review consistent with these findings and conclusions.

---

[20] The ALJ found plaintiff's job as a chip picker at the potato chip factory (approximately half of his 3-year employment) was performed at SGA level. (Tr. 284, 776-77).

[21] Plaintiff's earnings appear to have far exceeded the monthly income threshold for SGA while he was employed at the potato chip factory from 2010-2012. (Tr. 244-84, *see Defendant's Brief* at 4, n. 1).

IX.
INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these findings, conclusions and recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED February 11, 2020.

*[signature]*
LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

* **NOTICE OF RIGHT TO OBJECT** *

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).